Argued April 11, reversed July 1, 1919.

## PEERY v. FLETCHER.

(182 Pac. 143.)

**Life Estates—Lease—Emblements—Rights of Undertenant.**

1. Where a life tenant has leased land for the term of his life for a money rent payable annually, the doctrine of emblements applies with full force to the undertenant; he having even greater privileges than his lessor, the life tenant whom he represents.

**Life Estates—Lease by Life Tenant—Death of Lessor—Apportionment of Rent.**

2. At common law, where a life tenant leases the estate for a term of years at a yearly rent and dies before one of the rent days, the rent cannot be apportioned, and the tenant could quit free of rent from the last rent day; neither the personal representatives of the lessor nor the reversioner having power to collect the rent.

**Common Law—English Statutes—Applicability.**

3. English statutes passed before the emigration of our ancestors, in aid or amendment of the common law, applicable to our condition and not repugnant to our institutions, constitute a part of our common law.

**Common Law—Adoption—Applicability.**

4. The common law as it existed in England at the time of the settlement of the American colonies has been adopted so far only as its general principles were suited to the habits and conditions of the colonies and in harmony with the genius, spirits and objects of American institutions, and whether common-law rules will be followed strictly depends, where no vested rights are actually concerned, upon the extent of which they are reasonable and in consonance with public policy and sentiment.

> [As to adoption of common law, see note in **Ann Cas. 1918A,** 981.]

**Common Law—Adoption.**

5. In Oregon the common law of England was adopted as it existed, modified and amended by the English statutes passed prior to the Revolution.

**Life Estates—Lease—Apportionment of Rents—Effect of Death of Life Tenant—Common-law Rules—Adoption.**

6. The common law of England as modified by Statute of 11 Geo. II, c. 19, Section 15, giving an executor or administrator of a life tenant, on whose death a lease granted by him had determined, the right to recover of the tenant a ratable portion of the rent from the last day of payment to the death of lessor, being reasonable and suited to the conditions and customs of the state and not conflicting with the Constitution or statutes thereof, was adopted as part of the common law of the state.

**Statutes—Construction—Copied Statutes—Intent of Legislature.**

7. The rule that, where a statute is copied from that of another state, the construction of the duplicated statute by the highest court of the state from which it is taken will be adopted, does not apply where the legislature adopting the latter statute had a different intention.

**Landlord and Tenant—Payment of Rent—Constructive Eviction.**

8. There cannot be a constructive eviction without a surrender of possession, and the tenant will not be permitted to remain in possession and escape payment of rent by pleading a state of facts which, though conferring a right to abandon, has not been accompanied by the exercise of that right.

**Life Estates—Lease—Death of Life Tenant—Apportionment of Rent Due to Life Tenant by Subtenant.**

9. Where a life tenant leased the property for the period of the life tenancy for a money rent payable annually and died before annual crops had matured and before the annual rent for that year was due, the rent could be apportioned between the life tenant's personal representatives and the reversioner as to time, in view of Sections 7169, 7170, L. O. L., modifying the common-law rule that such rents could not be apportioned.

From Yamhill: HARRY H. BELT, Judge.

Department 2.

This is an appeal by plaintiff from a judgment overruling a demurrer to the defendant's answer and granting a judgment in favor of the defendant as for want of a reply.

The action is brought by the administrator of the estate of Catherine E. Martin, deceased, to recover rent reserved in two leases. On the seventeenth day of October, 1915, Catherine E. Martin, now deceased, was the owner and in the possession of an estate for

her own life of two parcels of land containing 56 acres. On that date, by her guardian, she leased 45 acres of the tract to the defendant Henry Lee Fletcher for the remainder of her natural life. According to the terms of the contract of leasing the defendant agreed to pay the lessor the sum of $180 per annum, payable on August 1st of each year; the first payment to be made on August 1, 1916.

The complaint alleges that the whole of the real property so leased was tillable, agricultural land, suitable for raising annual crops of grain; that the defendant entered into possession and proceeded to raise such crops and paid the rent for the first year on August 1, 1916; that thereafter defendant cultivated all of the land and planted the same to yearly crops of grain to be harvested during the season of 1917; that Catherine E. Martin died on the eleventh day of July, 1917, after the crops were planted. The other tract of eleven acres was, in October, 1916, leased by Catherine E. Martin to the defendant, who entered into the possession thereof and agreed to pay the lessor the sum of $4 per acre per year. This land was also cultivated in the same manner as the other tract mentioned.

The defendant answered setting up the leases, particularly alleging that the lessor named therein leased to defendant the real property for and during the natural life of Catherine E. Martin; that the lease provided that it should begin on the first day of October, 1915, and that it should terminate at the death of said Catherine E. Martin; that the defendant should pay rent for the premises during the life of the contract of lease, the amounts mentioned in the complaint, and that the rent should mature and become due and payable every year during the natural life of said Cath-

erine E. Martin on the first day of August; that she
died on the eleventh day of July, 1917, and the lease-
hold estate then terminated; that at the time of the
leasing the defendant was and now is the owner in fee
simple of two thirds of the 56 acres so leased, subject
only to the life estate therein of Catherine E. Martin
for and during her natural life only, and that the other
one third belonged to the estate of J. S. Martin, the
deceased husband of Catherine E. Martin, subject to
the life estate of Catherine E. Martin; that the defend-
ant had been in actual possession of all of the land
so leased to him ever since the death of Catherine
E. Martin as the owner in fee simple of two thirds
thereof, and by the consent of the administrator of
the estate of J. S. Martin, deceased, which is still being
administered as to the other one third. Defendant
alleges that by reason of the death of Catherine E.
Martin, on the eleventh day of July, 1917, no part of
the rent of $224 that would have become due and owing
to her on the first day of August, 1917, by the terms of
the lease, if she had lived until that date, ever became
due or payable to her or to her representatives or to
the plaintiff, and that all the crops raised on the prem-
ises during the year 1917, matured after the death of
Catherine E. Martin.

There were two separate answers to the separate
causes of action relating to the two tracts of land of
the purport above indicated.

Plaintiff demurred to defendant's answer for the
reason that the same did not state facts sufficient to
constitute a defense to plaintiff's complaint. The de-
murrer was overruled and the plaintiff by her counsel
having stated that she did not desire to plead further,
judgment was entered in favor of defendant for his
costs.                                    Reversed.

For appellant there was a brief over the name of *Messrs. McCain & Vinton,* with an oral argument by *Mr. W. T. Vinton.*

For respondent there was a brief over the name of *Messrs. Ramsey, Lange & Nott,* with oral arguments by *Mr. William M. Ramsey* and *Mr. L. E. Lange.*

BEAN, J.—It is submitted on behalf of plaintiff that where a tenant for life leases the real property to a subtenant and such tenant plants an annual crop and his estate terminates by the death of the life tenant after the planting of crops of annual growth and before the day for payment of rent, the under-tenant is entitled to such annual crops growing at the time of the death of his lessor as emblements and is entitled to ingress and egress to and from the land for the purpose of removing the same. Therefore as the defendant had the full benefit of the issues and profits of the land for the full year, he should pay the rents to the representative of the life tenant: Citing 2 Blackstone's Comm. (Lewis' ed.), 120–123; 4 Kent's Comm. (14 ed.), p. *73; Washburn on Real Property (6 ed.), 120 et seq.; *Noble* v. *Tyler,* 61 Ohio St. 432 (56 N. E. 191, 48 L. R. A. 735, 736) ; 16 Cyc. 620, subd. 4; *Carman* v. *Mosier,* 105 Iowa, 367 (75 N. W. 323, 324).

It is the position of counsel for defendant that the rule in regard to emblements does not apply if the owner of life estate leases the land to a tenant and the tenant covenants to pay him a money rent, and the lessor dies before the rent falls due, his representative cannot collect the rent because the life tenant's estate in the land terminated before the rent accrued, and the rent cannot be apportioned as to time, and money cannot be considered emblements.

1. The doctrine of emblements applies with full force in regard to the under-tenant. He has even greater privileges than his lessor, the life tenant, whom he represents; as in a case where such lessor forfeits his right to emblements by his own act; such act, or forfeiture does not deprive the under-tenant of his emblements: 2 Blackstone's Comm. (Lewis' ed.) 123; 4 Kent's Comm, (14 ed.), *74; 5 M. A. L., § 406, p. 317; *Edghill* v. *Mankhey,* 79 Neb. 347 (112 N. W. 570, 11 L. R. A. (N. S.) 689); *Bradley* v. *Bailey et al.,* 56 Conn. 374 (15 Atl. 746, 7 Am. St. Rep. 316, 1 L. R. A. 427, 428). In *Reed* v. *McGouirk* (Tex. Civ. App.) (35 S. W. 527), it was held that if a subtenant of a life tenancy rents only so many acres of land, on which to make a crop, with no right to retain the land after the crop is taken off, the life tenant's administrator has the right to all the rent reserved by the contract; but if the use of dwellings and pastures, and other valuable rights, are embraced in the rent contract, which, at the death of the life tenant, pass to the reversioner, the administrator is entitled to the full amount of the rent contract, less the fair proportionate value of the use of such of the premises as the tenant's crops do not occupy, estimated from the death of the life tenant to the end of the rental term as fixed by the contract.

The doctrine of emblements is not decisive of this case. The particular question is in regard to the rent upon which the rule in respect to emblements often has a bearing.

2. By the rule of the common law where a life tenant leases the estate for a term of years at a yearly rent and dies before one of the rent days, the rent cannot be apportioned and the tenant could quit free of rent from the last rent day. The rent could not be collected by the personal representatives of the lessor for

the reason that the lease terminated before any rent became due; and it could not be collected by the reversioner as the lessor's death terminated the lease. It has been held, however, that if the tenant remains in possession after the termination of the life estate and the reversioner acquiesces, the latter may recover for use and occupation from the lessor's death: *Hoagland* v. *Crum,* 113 Ill. 365 (55 Am. Rep. 424); *Guthmann* v. *Vallery,* 51 Neb. 824 (71 N. W. 734, 66 Am. St. Rep. 475). It has also been held that if the lessee of a tenant for life remains in possession after the termination of the life estate without any contract with the reversioner and pays the full amount of rent reserved in the lease to the administrator of the tenant for life, the reversioner has no claim against the estate of the life tenant for the rent thus paid.

The Statute of 11 Geo. II, Chapter 19, Section 15, gave the executor or administrator of a life tenant, on whose death a lease granted by him had determined, the right to recover of the tenant a ratable proportion of the rent from the last day of payment to the death of the lessor. The date of the Statute of 11 Geo. II is given as 1738. In some jurisdictions in this country statutes of similar import have been enacted or such statutes have been adopted by the courts as a part of the common law: *Perry* v. *Aldrich,* 13 N. H. 343 (38 Am. Dec. 493); note L. R. A. 1915C, p. 208. The English statute in terms applied only to leases granted by a life tenant where the life tenant died, and it has been held in this country in a case where the statute was assumed to be in force that the statute did not apply to a lease by one holding a life estate *pur autre vie: Perry* v. *Aldrich,* 13 N. H. 343 (38 Am. Dec. 493). In some jurisdictions in this country, it has been held

93 Or. —4

that the English statute was not in force and that the common law remains unchanged in this respect: *Hoagland* v. *Crum,* 113 Ill. 365 (55 Am. Rep. 424); 16 R. C. L., § 82, p. 603. Later legislation in England has gone still further. The Statute of 4 W. IV, see Chapter 22, after reciting that by law rents due at fixed periods were not apportionable, and after reciting the inconvenience of that rule, proceeds to declare that all rents made payable at such periods under any instrument executed after the passing of the act, should be apportioned so that on the termination, by death or any other means, of the estate of the person entitled to the rents, such person, or his representative, should have a portion of such rents, according to the time elapsed since the last period of payment. By a further provision, the entire rent is to be received and recovered from the tenant, by the person who would be entitled to recover it if the act had not been passed, and is to be held by him subject to apportionment, which can be enforced against him by suit at law, or in equity: *Marshal* v. *Moseley,* 21 N. Y. 280.

In 3 Kent's Comm. (12 ed.), *470, we read thus:

"The objection to the doctrine of the apportionment of rent was, that it exposed the tenant to several suits or processes of distress, for a thing which was originally entire, and he ought not to be obliged to pay his rent in different parcels, and to several landlords, when he contracted to pay, in one entire sum, to one person. But the convenience of mankind dictated the necessity of an apportionment of rent in a variety of cases. Though it was a principle of the common law that an entire contract could not be apportioned, yet the apportionment of rent was, under certain circumstances, allowed by the common law, either on severance of the land from which it issued, or of the reversion to which it was incident. A person has a right to sell the whole or any part of his reversionary interest

in land. It may be necessary to divide his estate out on rent·among his children, or to sell part to answer the exigencies of the family; and it would be intolerable if such a necessary sale worked an extinguishment of the whole rent. The rent passes as an incident to the purchaser of the reversion, and the tenant may always avoid several suits and distresses by a punctual payment of his rent.''

In Tiedeman on Real Property, Section 67, after stating the common-law rule, the author states:

''But this injustice of the common law has now been remedied by statutory changes, so that now generally, the rent is apportioned between the life tenant and reversioner, giving each his *pro rata* share according to the time of enjoyment of the lease before, and after, the tenant's death. And the personal representatives of the life tenant may sue the tenant for years for the rent which may be apportioned to him.''

See 1 Washburn on Real Property (6 ed.), Sections 245, 246.

It is the position of counsel for plaintiff that the English statutes adopted prior to the settlement of the colonies became part of the common law of the colonies. Citing among other authorities, *Evans* v. *Cook,* 11 Nev. 69; *Ex parte Blanchard,* 9 Nev. 101; *Commonwealth* v. *Knowlton,* 2 Mass. 529, 530. In the latter case the court at page 534 of 2 Mass., uses the following language:

''Our ancestors, when they came into this new world, claimed the common law as their birthright, and brought it with them, except such parts as were judged inapplicable to their new state and condition. The common law, thus claimed, was the common law of their native country, as it was amended or altered by English statutes in force at the time of their emigration. Those statutes were never re-enacted in this country, but were considered as incorporated into the

common law. Some few other English statutes, passed since the emigration, were adopted by our courts, and now have the authority of law derived from long practice.''

. 3. It is stated as a general rule that English statutes passed before the emigration of our ancestors, in aid or amendment of the common law, applicable to our condition, and not repugnant to our institutions, constitute a part of our common law: 6 Am. & Eng. Enc. of Law (2 ed.), 277; *Norris* v. *Harris,* 15 Cal. 226; *Hunt* v. *Chicago etc. Ry. Co.,* 20 Ill. App. 282, 289; *Swift* v. *Tousey,* 5 Ind. 196; *Baker* v. *Crandall,* 78 Mo. 584 (47 Am. Rep. 126); *Hamilton* v. *Kneeland,* 1 Nev. 40; *Borgardus* v. *Trinity Church,* 4 Paige Ch. (N. Y.) 178; *Van Rensselaer* v. *Hays,* 19 N. Y. 68 (75 Am. Dec. 278).

The Constitution of the State of Oregon became operative April 14, 1859. By Article XVIII, Section 7 of that organic law, it is provided that:

''All laws in force in the territory of Oregon when this Constitution takes effect, and consistent therewith, shall continue in force until altered or repealed.''

See *Runyan* v. *Winstock,* 55 Or. 202 (104 Pac. 417, 105 Pac. 895).

4, 5. The common law, as it existed in England at the time of the settlement of the American colonies, has never been in force in all of its provisions in any colony or state of the United States. It has been adopted so far only as its general principles were suited to the habits and conditions of the colonies, and in harmony with the genius, spirit and objects of American institutions. Different geographical conditions may justify modifications, and whether common-law rules will be followed strictly in the United States

will, necessarily, where no vested rights are actually
concerned, depend upon the extent to which they are
reasonable and in consonance with public policy and
sentiment.   What may be the common law in one state
is not necessarily so considered in another.   In many
jurisdictions in the United States the rules of the com-
mon law of England have been held by the courts to
be in full force so far as the same are applicable and
of a general nature, and are not in conflict with the
Constitution or special enactments of the legislature.
This is the rule in Oregon: See note, 30 Ann. Cas.
1913E, pp. 1232, 1241; *Brummet* v. *Weaver,* 2 Or. 168;
*Rugh* v. *Ottenheimer,* 6 Or. 231 (25 Am. Rep. 513);
*Velten* v. *Carmack,* 23 Or. 282 (31 Pac. 658, 20 L. R. A.
101).   In some of the states all statutes and acts of
the British parliament which were passed prior to the
fourth year of James the First are declared to be a
part of the law of the state: 6 Am. & Eng. Enc. of Law
(2 ed.), p. 278.   The common law with all the statutes
amending it prior to a certain time was adopted ex-
cluding statutes passed afterwards unless expressly
adopted.   In applying the general rule to a state which,
like ours, had no political existence before the Revolu-
tion, it must in harmony with reason be held that when
our territorial legislature and the framers of our Con-
stitution and our courts recognized the existence here
of the common law, they must have had reference to
that law as it existed, modified and amended by the
English statutes passed prior to the Revolution:
*Coburn* v. *Harvey,* 18 Wis. 156; *State* v. *Rollins,* 8
N. H. 550; *Bent* v. *Thompson,* 5 N. M. 408 (23 Pac.
234); *O'Ferrall* v. *Simplot,* 4 Iowa, 381; *Dawson* v.
*Coffman,* 28 Ind. 220; *Borgardus* v. *Trinity Church,* 4
Paige Ch. (N. Y.) 178, 198.   It is not necessary in the
case at bar to fix the exact age of the English statutes

which were engrafted into the common law and recognized as apart of the law of this state.

6. It goes without saying that the common law of England as modified by the Statute of 11 Geo. II, Chapter 19, Section 15, is reasonable and suited to the conditions and the customs as they have existed in this state ever since its admission to the Union, and is in no way in conflict with the Constitution or statutes of this state.

As we view it the question in this case as between the administrator of Catherine E. Martin the life tenant, now deceased, and the lessee should be considered in the same manner as though the lessee of the life tenant was not the reversioner of any part of the estate. Section 7169, L. O. L., which has seldom, if ever, been applied, provides as follows:

"Every person in possession of land out of which any rent is due, whether it was originally demised in fee, or for any other estate of freehold, or for any term of years, shall be liable for the amount or proportion of rent due from the land in his possession, although it be only a part of what was originally demised."

Section 7170 reads:

"Such rent may be recovered in an action at law, and the deed of demise, or other instrument in writing, if there be any, showing the provisions of the lease, may be used in evidence by either party, to prove the amount due from the defendant."

Upon the first reading of our statute, while it is couched in different language from the statute of 11 Geo. II, Chapter 19, Section 15, seems to be in broad terms and evidently adopts the principle of the English statute, and there is much reason to believe that it was aimed to cure the mischief of the old common-law rule prohibiting the apportionment of rent *pro rata* as

to time as well as other supposed defects and conditions of such rule.

In note to *Ex parte Smyth,* 1 Swanston's Rep. 337–340, we find that:

"In *Wykham* v. *Wykham,* Sir James Mansfield inquired whether 'It had ever been determined that the executor of a tenant *pur autre vie* is entitled to recover a portion of the rent from the last quarter-day under the statute?' observing, that 'he is certainly within the mischief; for otherwise, the tenant of the land may keep the rent for his own benefit': 3 Taunt. 331."

The provisions of these sections of our Code were referred to in the following cases: *Stewart* v. *Perkins,* 3 Or. 508; *Holman* v. *De Lin River Finley Co.,* 30 Or. 428 (47 Pac. 708); *Campbell* v. *Stetson,* 2 Met. (Mass.) 504. In *Stewart* v. *Perkins,* 3 Or. 508, this court said:

"The old common-law doctrine was that a rent charge could not be apportioned by the act of the landlord, on the principle that the contract was an entirety, and could not be apportioned. The objection was 'that it exposed the tenant to several processes of distress for a thing which was originally entire, and he ought not to be obliged to pay his rent in different parcels, and to several landlords, when he contracted to pay one entire sum to one person.'

"Sections 31 and 32 of the statute heretofore referred to (now Sections 7169 and 7170, L. O. L.) were copied from Sections 22 and 23 of Chapter 60, of the Revised Statutes of Massachusetts. They were adopted there, to remedy a supposed defect in the old law, and to authorize an apportionment of rent in certain cases where a reversioner wishes to sell his estate in different parts, to different persons, or to make provision for his children. The Supreme Court, the highest judicial tribunal of that state, has given a judicial construction to the two sections contained in their statute. In *Campbell* v. *Stetson,* reported in 2

Met. (Mass.) 504, Shaw, C. J., in delivering the opinion of the court, says:

" 'These are part of a series of provisions respecting long terms, where a rent is reserved, and where the lands out of which such rents are to issue, are to be treated as real estate, and as such may be divided and subdivided by descent, partition, levy of execution and otherwise, with various detailed provisions in regard to terms, and the apportionment and recovery of rents. But these statutes do not declare when, and by what acts, a right to rent shall be created, vested, and transferred, but only declare how it may be recovered when it is due; that is, apportioned and recovered in an action of debt. They are intended to prescribe remedies—not to establish rights.' "

Massachusetts has a statute Section 4 of Chapter 121, Public Statutes of Mass. 1882, which reads:

"Every person in possession of land out of which rent is due shall be liable for the amount or proportion of rent due from the land in his possession, although it is only a part of what was originally demised."

Section 5 of that chapter being identical with Section 7170, L. O. L. If the construction contended for by defendant is the interpretation of this statute which our lawmakers intended to serve the people of this state since 1854, it is difficult to conceive the purport of the addition in one of the sections of the Massachusetts statutes and also in our Section 7169, which addition is in the following words:

"Whether it was originally demised in fee, or for any other estate of freehold, or for any term of years."

It is submitted by the learned counsel for the defendant, that the Massachusetts statute from which ours was taken intended to make provision for the apportionment and collection of rents only where the

demised lands, after the execution of the lease, were divided or subdivided. In other words, that the apportionment of rent as to estate is permissible, but that such an apportionment cannot be made as to time. We may say there is much force to the proposition as we do not claim the matter is free from doubt.

In 16 R. C. L., Section 445, page 938, it is stated in regard to the apportionment of rent with respect to time after announcing the common-law rule as follows:

"The hardship in the case of the death of a lessor holding for his own life was remedied by the Act of 11 Geo. II, c. 19, which authorized a recovery by his personal representatives of a proportionate part of the rent, where such a tenant died before or on that day on which the rent became due, and similar statutes have been enacted in some jurisdictions in this country. This provision, however, has been held not to apply in case of a lease by a tenant *pur autre vie* terminated by the death of the *cestui que vie*. In case of a total eviction of the tenant by the wrongful act of the landlord or even by a title paramount, there is no apportionment of the rent with respect to time, and therefore the tenant is not liable for any portion of the unaccrued rent, though he enjoyed the use of the premises for a time after the last rent day."

7. The rule where a statute is copied from that of another state that the construction of the duplicated statute by the highest court of the state from which it is taken, is subject to important modifications. A different construction is often given where it is plain that the legislators adopting the later statute meant differently. From the few decisions in the State of Massachusetts involving the different statutes there enacted it is difficult to determine the real intent and applicability of a portion of their statutes owing to partial repetitions in such enactments: Endlich, Inter-

pretation of Statutes, § 371; Black on Interpretation of Laws, § 70, p. 160; *Browning* v. *Smiley-Lampert Lumber Co.*, 68 Or. 502, 517 (137 Pac. 777).

In Endlich on Interpretation of Statutes, section 371, the author states:

"But, as applied to transcribed statutes, this rule is undoubtedly subject to important qualifications. Whilst admitting that the construction put upon such statutes by the courts of the state from which they are borrowed is entitled to respectful consideration, and that only strong reasons will warrant a departure from it, its binding force has been wholly denied, and it has been asserted that a statute of the kind in question stands upon the same footing, and is subject to the same rules of interpretation as any other legislative enactment. And it is manifest that the imported construction should prevail only in so far as it is in harmony with the spirit and policy of the general legislation of the home state. * * *"

Referring to Section 7169, L. O. L., "Every person in possession of land," the defendant Fletcher was in possession of the land in question. "Out of which any rent is due," rent is due out of the land leased by Mrs. Martin. "Whether it was originally demised in fee, or for any other estate of freehold." Mrs. Martin, the lessor, held a life estate, or an estate of freehold in the land, "Shall be liable for the amount or proportion of rent due from the land in his possession." Is the defendant liable for the proportion of the rent due from the land of which he held possession according to the terms of his agreement? Section 7170, L. O. L., provides that the rent may be recovered in an action at law.

The familiarity with the common law and English statutes, of some of the earlier lawmakers who drafted Sections 31 and 32 of the Statutes of Oregon of 1855,

which are now Sections 7169 and 7170, L. O. L., affords
reason to believe that it was the purpose of the fram-
ers of the law to declare a rule which would cure the
supposed defect and remedy the mischief of the old
common law by sanctioning the principle of the Stat-
ute of 11 Geo. II, Chapter 19, Section 15, and also of
subsequent legislation adopted in England prior to the
Revolution, all in one statute instead of in several,
thereby making the rule plain that one in possession
of land leased to him by another who is the owner of
an estate therein for his own life, or the owner of an
estate for the life of another person reserving rent to
be paid at stated periods, and where such lessor dies
between two rent days, and also where the estate of a
reversioner or remainder man is conveyed or descends
in separate parcels, shall be liable for such rent, and
that the same may be apportioned either as to time or
estates.

8. The lease in question by its terms provided that
it was to begin October 1, 1915, and to terminate at the
death of Catherine E. Martin. There was no eviction
of the lessee prior to the expiration of the lease.
When Mrs. Martin died the lease simply terminated
in accordance with the terms thereof. The land was
not leased for a definite term of years. There was no
breach of the contract of lease, either technical or
otherwise, occasioned by the determination of the
lease. There were excepted from the provisions of
the lease, pasture and timber lands of the farm. All
of the land leased during the last year was cultivated
to annual crops so that the lessee having the right to
enter and remove such crops after the termination of
the lease obtained practically the full benefit of the
land for the crop year of 1917. No notice appears to
have been given by the defendant, the lessee, who re-

mained in possession of the land after the death of Mrs. Martin, that he was claiming possession thereof by virtue of any authority other than the lease. There cannot be a constructive eviction without a surrender of possession, and it would be unjust and unconscionable to permit the tenant to remain in possession and then escape the payment of rent by pleading a state of facts which, though conferring a right to abandon, had been unaccompanied by the exercise of that right: 16 R. C. L., § 457, p. 949. Citing *Keating* v. *Springer,* 146 Ill. 481 (34 N. E. 805, 37 Am. St. Rep. 175, 22 L. R. A. 544) ; *Leiferman* v. *Osten,* 167 Ill. 93 (47 N. E. 203, 39 L. R. A. 156) ; *Boreel* v. *Lawton,* 90 N. Y. 293 (43 Am. Rep. 170). It is not easy to account for the lack of further legislation in this state in regard to the apportionment of rents except that the belief was general that such legislation was unnecessary and Section 7169 covered the field the same as the English law.

9. The difficulty arises in this case by virtue of the subtenant being the reversioner of the leased land. As before stated, a proper solution can only be reached by treating him the same as if the land were leased to another person having no prospective interest therein. Based largely upon the common law, as modified by the English statute, which we think is appropriate to our conditions, and is adopted in this state, we hold that the rent in question should be apportioned.

This conclusion requires the reversal of the judgment of the lower court and a direction of a judgment in favor of plaintiff for the rent of the demised premises for nine and one-third months, or $174.20.

REVERSED WITH DIRECTIONS.

McBRIDE, C. J., and JOHNS and BENNETT, JJ., concur.